2026 IL App (1st) 240992-U

No. 1-24-0992

Order filed June 11, 2026

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

---

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

---

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 19 CR 03938 |
| | ) | |
| OMAR NICASIO, | ) | Honorable |
| | ) | Pamela Stratigakis, |
| Defendant-Appellant. | ) | Judge, presiding. |

---

JUSTICE LYLE delivered the judgment of the court.
Justices Ocasio and Quish concurred in the judgment.

**ORDER**

¶ 1     *Held*:  The circuit court's summary dismissal of defendant's postconviction petition is affirmed over his claims that trial counsel provided ineffective assistance and that postconviction counsel provided unreasonable assistance.

¶ 2     Defendant Omar Nicasio appeals from the summary dismissal of his petition for relief filed

under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq*. (West 2024)) relating to

his conviction for predatory criminal sexual assault (PCSA) of the minor victim, A.G. On appeal,

Mr. Nicasio argues that the circuit court erred in summarily dismissing his petition, because he set

forth the gist of claims that: (1) his trial counsel was ineffective for failing to investigate and present witnesses to undermine A.G.'s credibility, and (2) his postconviction counsel was unreasonable for failing to attach a medical expert's affidavit to Mr. Nicasio's petition. For the following reasons, we affirm.

¶ 3    At trial, A.G., then 19 years old, testified that she met Mr. Nicasio in 2007, when she was 4 years old. Mr. Nicasio is the brother of A.G.'s stepfather, Eliseo Nicasio (Eliseo). A.G. and her mother moved into a house in Chicago with Eliseo and his family, including Mr. Nicasio, his parents Amalia Nicasio (Amalia) and Martin Nicasio Sr., his sisters Priscilla Nicasio and Katherine Nicasio (Katherine), and his brother Martin Nicasio (Martin) and Martin's wife, Isela Camacho (Isela). In May 2011, soon after A.G.'s sister was born, everyone moved to a home in Calumet City. A.G.'s mother worked during the day and Eliseo worked "third shift," so A.G. was often left in the care of Isela or Amalia. Mr. Nicasio was "left in charge" of A.G. on multiple occasions.

¶ 4    A.G. testified to several incidents of sexual assault by Mr. Nicasio at the Chicago home. Mr. Nicasio was found not guilty as to those incidents, but we summarize portions of A.G.'s testimony about those incidents to the extent it pertains to Mr. Nicasio's postconviction claims.

¶ 5    A.G. recalled an incident at the Chicago home when Mr. Nicasio was left in charge of her and her three cousins and they played hide-and-seek. While the others hid, Mr. Nicasio grabbed A.G. around the waist, held her "against his crotch," and pushed her down. Mr. Nicasio told her to "grind on him," and "do it harder." A.G. felt Mr. Nicasio's penis on her back and "sliding on [her] butt." Through the duration of the game, Mr. Nicasio insisted that A.G. remain the "seeker," and repeated his actions towards her.

¶ 6    A.G. also recalled an incident at the Chicago home when she was around five or six years old, where she and her cousins were going to play in Mr. Nicasio's room. Only A.G. and Mr. Nicasio were in the room at the time. As A.G. was about to sit down, Mr. Nicasio placed his hand palm up and told her to sit on it. She sat down on his hand because she believed he was going to "tell on [her]."

¶ 7    When A.G. was around eight years old, the family moved to Calumet City. She recalled an incident soon afterwards, where Mr. Nicasio approached her from behind while she was lying on her stomach on her bedroom floor playing with something. Moving boxes were still in the room. It was nighttime, her parents were not home, and she did not know the whereabouts of the others. Mr. Nicasio pulled down her pants, put his penis in her anus, and was "grinding into" her. He told her to be quiet, and when he was done, he left some money by her head. A.G. testified that he would often leave money for her.

¶ 8    When A.G. was around 11 years old, she stayed home from school sick, and Mr. Nicasio approached her from behind while she was at the bathroom sink. He pulled down her pants and his own pants, pushed her into the sink, and put his penis in her anus.

¶ 9    When A.G. was around 11 or 12 years old, while her mother and Eliseo were not home, Mr. Nicasio approached her in her room. She was on her back on the floor, and Mr. Nicasio "had his penis in [her] *** and he kept thrusting into [her] while [she] was on the floor."

¶ 10    A.G. testified that the "last incident" occurred at a New Year's Eve party in 2015, when she was in seventh grade. A.G., along with her parents and sister, moved out of the family home in 2016.

¶ 11    A.G. never told anyone what happened to her because Mr. Nicasio threatened and blackmailed her. He claimed to have a recording of her, which she had never seen, and threatened to show it to her mother. He told her that if her mother heard the recording, her mother would disown her and not love her anymore, and she would have nowhere to go. A.G. believed Mr. Nicasio, who always said similar things to her.

¶ 12    In September 2018, when A.G. was 15 years old, she received a school assignment to write an essay on "acceptance." In her essay, A.G. decided to detail what had happened to her, because Mr. Nicasio had "re-entered" her life after the family moved out of the Calumet City house. Mr. Nicasio came to the new house to "hang out" with Eliseo and would make inappropriate comments when Mr. Nicasio and A.G. were alone. In October 2018, a few weeks after submitting her assignment, A.G. spoke with a school counselor. She then spoke with her mother, who called Eliseo. The next day, A.G. went to the doctor for an examination.

¶ 13    On cross-examination, A.G. testified that Amalia threatened that she had a recording of A.G. saying that she wanted a relationship with Eliseo, hated her mother, and "things of that sort." A.G. neither saw nor heard the recording, and she was never made to say such things on a recording. When A.G. mentioned the recording to Amalia, Amalia told A.G. that A.G. had a "certain amount of strikes" and Amalia would threaten to show the recording to A.G.'s mother. A.G. told her mother about Amalia's threats, and they moved out of the house. A.G. testified that she never screamed or made sounds when the incidents with Mr. Nicasio occurred. She never observed blood or other substances after the incidents.

¶ 14    Eliseo testified that on October 12, 2018, he was home with Mr. Nicasio and received a phone call from A.G.'s mother. Following the call, Eliseo told Mr. Nicasio that A.G. said that Mr.

Nicasio was "molesting her for plenty of years." Mr. Nicasio "reacted spooked," said that "he did not need another DCFS case," and left the house "[i]n a rush." Eliseo had not seen Mr. Nicasio since that day.

¶ 15    On cross-examination, Eliseo testified that he told Mr. Nicasio to leave the house after Eliseo spoke to A.G.'s mother on the phone.

¶ 16    The State introduced a stipulation that, if called, a nurse practitioner would testify that on October 13, 2018, she examined A.G. A.G. related that Mr. Nicasio had sexually assaulted her "numerous times" from the ages of 6 to 12. The incidents occurred when her family was out of the house or Mr. Nicasio was alone with her, and "included oral, vaginal, and anal penetration, as well as fondling, groping, and psychological trauma by taunting her." Mr. Nicasio "blackmailed her to keep quiet," but A.G. did not specify the blackmail. According to A.G., the last encounter with Mr. Nicasio occurred when she was around 12 or 13 years old. Even after the "sexual abuse" ended, Mr. Nicasio "torture[d] her mentally and emotionally." A.G. appeared "anxious, distressed, tearful, and emotional" when she recounted the events.

¶ 17    The nurse practitioner physically examined A.G., who was "hyper-responsive" and "would jump when touched and was very tense." The exam revealed normal internal and external appearance "with no evidence of trauma, bleeding, lesions, masses, or sores."

¶ 18    Mr. Nicasio moved for a directed finding, arguing, *inter alia*, that "no physical evidence corroborat[ed] the allegations of anal and vaginal trauma." The court denied the motion.

¶ 19    During closing arguments, the State noted that the nurse practitioner's examination showed "no findings of anything" but argued that signs of physical trauma would not be expected three years after the assaults ended. The court remarked that "there's no evidence" in the record of what

one would expect to see three years later, and "[t]he only reasonable inference [it] can take from that is that it's pretty much common knowledge and probably something [it] could take judicial notice of if [it] was asked. A child grows *** in a period of three years given the age that she was at." Defense counsel noted that "nothing was found back in 2018" and remarked that no medical testimony was presented that growing older would mask physical evidence of trauma that occurred three years earlier. The court stated that there was no evidence that "if these acts occurred in the manner that [A.G.] testified to that you would expect in 2018 to see evidence of it."

¶ 20    The court found Mr. Nicasio guilty of three counts of PCSA of a child. The three counts related to the incidents that occurred between March 19, 2011, and December 31, 2011, and between January 1, 2012, and December 31, 2016, relating to two incidents of anal penetration and one incident of vaginal penetration. The court found Mr. Nicasio not guilty with respect to seven other counts. It noted that A.G.'s testimony described events "over a period of many years and two locations," and although she "certainly didn't give every step of the way details about these multiple events, *** she did give information that is more or less unique." The court found corroborating that when Eliseo informed Mr. Nicasio of A.G. complaining about molestation, Mr. Nicasio gave "no denial."

¶ 21    Mr. Nicasio filed a posttrial motion arguing, *inter alia*, that no medical testimony corroborated the accusations. The court denied the motion. The court sentenced Mr. Nicasio to a total of 24 years in prison.

¶ 22    On direct appeal, Mr. Nicasio's appointed counsel filed a motion for leave to withdraw pursuant to *Anders v. California*, 386 U.S. 738 (1967). Counsel considered, but found without arguable merit, *inter alia*, whether the evidence was insufficient to prove Mr. Nicasio guilty of

PCSA of a child beyond a reasonable doubt. We affirmed, and granted counsel's motion for leave to withdraw, noting that the trial court found A.G. credible, and her testimony detailed two incidents of anal penetration and one incident of vaginal penetration. *People v. Nicasio*, No. 1-22-1135 (2023) (unpublished summary order under Illinois Supreme Court Rule 23(c)).

¶ 23    On January 17, 2024, Mr. Nicasio filed the instant postconviction petition through private counsel. In the petition, Mr. Nicasio argued, *inter alia*, that his trial counsel was ineffective for failing to (1) investigate or present testimony from Katherine (Mr. Nicasio's sister) and Amalia (Mr. Nicasio's mother) to undermine A.G.'s credibility and (2) present medical testimony supporting Mr. Nicasio's position that A.G. would have sustained physical injuries had she been sexually assaulted. Attached to the petition were affidavits from Mr. Nicasio, Katherine, and Amalia.

¶ 24    Mr. Nicasio averred that he told his trial counsel that family members who lived with him and A.G. wished to testify but counsel never contacted them. Mr. Nicasio informed his counsel that "[a]s far as I know," Amalia never threatened A.G. with any alleged recording and no such recording existed. Mr. Nicasio further averred that Eliseo lied about the events on the day of A.G.'s accusations, as he had denied the accusations to Eliseo. Mr. Nicasio also asserted that A.G. lied that he criminally molested, abused, and assaulted her.

¶ 25    Katherine averred that, had she been called at trial, she would have testified that Isela (Mr. Nicasio's sister-in-law) never babysat A.G., and Katherine "didn't know of any time whatsoever where [Mr. Nicasio] was left in charge of the children." Katherine never observed A.G. exhibit fear or anxiety around Mr. Nicasio and there was "no indication whatsoever that anything was ever wrong" between them. A.G. never produced money from unknown sources or purchased things

with "such mystery money." Katherine and A.G. were close in age, had a close relationship, and Katherine would have expected A.G. to confide in her if anything bad happened to A.G. A.G. never indicated or "even hint[ed]" at sexual assault or impropriety "by anyone at all." Katherine never observed blood or bodily fluids on A.G.'s clothing, bedding, towels, or rags. Katherine never played hide-and-seek where Mr. Nicasio kept A.G. as the seeker, and she never observed A.G. sitting on Mr. Nicasio's hand. Katherine and her parents visited trial counsel's office on two occasions to inform counsel that they were willing to testify, but counsel never contacted Katherine.

¶ 26　Amalia averred that she would have testified that Mr. Nicasio was never left in charge of A.G. or the younger family members "as best I can recall," and A.G. was "never left alone to fend for herself." Amalia occasionally watched A.G., and A.G.'s mother watched her the rest of the time. Amalia denied recording A.G., knowing about the existence of any such recording, threatening A.G. with the recording, or alleging "strikes." Amalia never observed any bodily fluids on A.G.'s clothing from ages 4 to 15 and never saw A.G. with money of unknown origin. Amalia, Mr. Nicasio's father, and Katherine visited trial counsel's office and were sent away. Counsel never contacted them.

¶ 27　On April 12, 2024, the circuit court summarily dismissed the petition in a written order. Regarding the lack of expert medical testimony, the court found that counsel was not deficient in failing to present any such testimony where the trial court found A.G.'s testimony credible and corroborated by Eliseo and the nurse practitioner, and prejudice could not be shown where the evidence at trial was sufficient to find Mr. Nicasio guilty of PCSA of a child. Regarding counsel's

failure to call Katherine and Amalia, the court noted that the decision to call a particular witness is a matter of trial strategy and the evidence at trial supported Mr. Nicasio's convictions.

¶ 28   On appeal, Mr. Nicasio challenges the summary dismissal of his petition, arguing that he raised the gist of claims of ineffective assistance of trial counsel and unreasonable assistance of postconviction counsel.

¶ 29   The Act provides criminal defendants with a means to challenge their convictions or sentences based on substantial violations of their rights under the federal or state constitutions. 725 ILCS 5/122-1(a) (West 2024); *People v. Knapp*, 2020 IL 124992, ¶ 43. The Act sets forth a three-stage process for adjudicating a postconviction petition. *People v. English*, 2013 IL 112890, ¶ 23. In this case, the circuit court dismissed the petition at the first stage. The first stage of proceedings presents a "low threshold," requiring only that "the petitioner plead sufficient facts to assert an arguably constitutional claim." *People v. Johnson*, 2021 IL 125738, ¶ 25.

¶ 30   If the circuit court determines that the petition is "frivolous or is patently without merit," the petition shall be dismissed in a written order. 725 ILCS 5/122-2.1(a)(2) (West 2024). A petition may be found frivolous or patently without merit where the petition has "no arguable basis either in law or in fact." *People v. Hodges*, 234 Ill. 2d 1, 12 (2009). The circuit court must take the allegations in the petition as true and liberally construe them. *People v. Allen*, 2015 IL 113135, ¶ 25. We review summary dismissals of postconviction claims *de novo*. *People v. Joiner*, 2024 IL 129784, ¶ 20.

¶ 31   Mr. Nicasio first argues that he stated the gist of a claim of ineffective assistance of trial counsel where counsel failed to interview and present Katherine and Amalia as witnesses to undermine A.G.'s credibility.

¶ 32    "Whether the failure to investigate or present a witness constitutes ineffective assistance of counsel is determined by the value of the evidence not presented at trial and the closeness of the evidence that was presented at trial." *People v. Harmon,* 2013 IL App (2d) 120439, ¶ 26. Under the Act, a petition that alleges ineffective assistance of counsel may not be summarily dismissed if it is arguable that (1) counsel's performance fell below an objective standard of reasonableness, and (2) the defendant was prejudiced. *Joiner*, 2024 IL 129784, ¶ 33. Both prongs must be satisfied. *People v. Bush*, 2022 IL App (1st) 210509, ¶ 31. As such, we may first consider the prejudice prong. *People v. Eubanks*, 2021 IL 126271, ¶ 31. Under the prejudice prong, the defendant bears the burden of showing that "it is *arguable* that the outcome of his case would have been different absent the deficient representation." (Emphasis in original.) *People v. Wilson*, 2013 IL App (1st) 112303, ¶ 20.

¶ 33    Here, Mr. Nicasio has not shown that trial counsel's failure to interview or present testimony from Katherine and Amalia renders it arguable that the outcome of his trial would have been different. The evidence at trial was strong, and the trial court noted that A.G. testified with "information that is more or less unique," including locations and times. A.G.'s testimony was strengthened by Eliseo's testimony that when he confronted Mr. Nicasio, Mr. Nicasio appeared "spooked," stated he "did not need another DCFS case," and did not deny or rebut A.G.'s allegations. The nurse practitioner's stipulated testimony also corroborated A.G.'s trial testimony regarding the sexual assault by establishing that A.G. appeared "anxious, distressed, and tearful and emotional" when she recounted the events and "tense" and "hyper-responsive" during the exam. All these factors, taken together, support A.G.'s testimony.

¶ 34    Mr. Nicasio contends that Katherine and Amalia's testimony would have undermined A.G.'s credibility as Katherine and Amalia would have testified that they never witnessed Mr. Nicasio sexually assault A.G. But A.G. testified that Mr. Nicasio sexually assaulted her when they were alone or no one else was around. Thus, Katherine and Amalia's statements attesting to not having observed any sexual assault would not have undermined A.G.'s testimony. Also, Katherine averred that she was "unaware" of an occasion where A.G. was left in Mr. Nicasio's care and Amalia averred "as best I can recall" that Mr. Nicasio was never left alone with A.G. or any child. Katherine and Amalia's vague proposed testimony disputing whether Mr. Nicasio was left alone with or in charge of A.G. lacked sufficient definitiveness to arguably change the outcome of the trial. *People v. Townsend*, 2020 IL App (1st) 171024, ¶¶ 22-23.

¶ 35    Katherine and Amalia also averred that they did not observe any physical evidence in the form of bodily fluids on the laundry in the home from a sexual assault. However, those averments are not inconsistent with A.G.'s testimony, because A.G. denied ever observing any such things following the assaults. The averments that Katherine and Amalia did not observe A.G. with additional money also would not undermine A.G.'s testimony as that matter could have gone unnoticed. Likewise, Katherine and Amalia's averments regarding their observations of A.G. and Mr. Nicasio's general interactions would not have undermined A.G.'s credibility as to incidents that occurred in private.

¶ 36    Katherine's averment to not recalling the relevant hide-and-seek game or the incident where A.G. sat on Mr. Nicasio's hand addressed only two of many incidents that A.G. recounted. Moreover, although Mr. Nicasio contends that the proposed testimony would have undermined A.G.'s credibility, Mr. Nicasio's three convictions of PCSA of A.G. were not based upon either of

those two incidents. Amalia averred that she did not make a recording of A.G., but A.G. never accused Amalia of personally making the recording, and Amalia's lack of knowledge of any such recording would not have arguably changed the outcome of the trial.

¶ 37    In sum, taking Katherine and Amalia's affidavits as true, counsel's failure to interview or present their testimony did not arguably prejudice Mr. Nicasio. Based on the strength and detail of A.G.'s testimony on the counts on which Mr. Nicasio was found guilty, we cannot find that had Katherine and Amalia testified to the facts in their affidavits, the trial court would have been presented with the evidence necessary to arguably change the outcome of Mr. Nicasio's trial. *Wilson*, 2013 IL App (1st) 112303, ¶ 20.

¶ 38    Mr. Nicasio next argues that postconviction counsel provided unreasonable assistance by failing to attach to Mr. Nicasio's petition a medical expert's affidavit regarding whether injuries to A.G. would be present three years after the assaults ended. According to Mr. Nicasio, such an affidavit would have supported the claim of trial counsel's ineffectiveness for failing to present medical expert testimony to undermine A.G.'s testimony of sexual assault where there was no physical corroboration of her allegations.

¶ 39    There is no constitutional right to effective assistance of counsel in postconviction proceedings. *People v. Johnson¸* 2018 IL 122227, ¶ 16. The Act guarantees a defendant only a "reasonable level" of assistance from counsel. *People v. Pendleton*, 223 Ill. 2d 458, 472 (2006). A reasonable level of assistance is "less than that afforded by the federal or state constitutions." *Id*. This right is not limited to appointed counsel, but also to privately retained counsel at the first stage. *Johnson¸* 2018 IL 122227, ¶¶ 18, 23. We review *de novo* whether postconviction counsel provided reasonable assistance. *People v. Williams*, 2025 IL 129718, ¶ 41.

¶ 40    A petition may be found frivolous or patently without merit if it is not supported by "affidavits, records, or other evidence," or if it fails to provide an explanation for the absence of such documentation. 725 ILCS 5/122-2 (West 2024). This is to ensure that the allegations in a petition are independently corroborated. *People v. Delton*, 227 Ill. 2d 247, 254 (2008). Failure to attach the relevant supporting documentation justifies the summary dismissal of a postconviction petition. *People v. Collins*, 202 Ill. 2d 59, 66 (2002). Reasonable assistance by postconviction counsel therefore requires counsel to "attempt to obtain evidentiary support for claims raised in the post-conviction petition." *People v. Johnson*, 154 Ill. 2d 227, 245 (1993).

¶ 41    A claim that trial counsel was ineffective for failing to call a witness must be supported by an affidavit from the proposed witness. *Harmon*, 2013 IL App (2d) 120439, ¶ 30. However, a petition may survive without such attachments if the allegations are uncontradicted and supported by the record. *Id*. As noted, we review the summary dismissal of a postconviction petition *de novo*. *Id*. ¶ 22.

¶ 42    Here, postconviction counsel did not attach an affidavit from a medical expert regarding physical injuries A.G. would have sustained had the sexual assault occurred as she testified. Mr. Nicasio argues that in failing to do so, postconviction counsel provided unreasonable assistance and, therefore we should remand for second-stage proceedings without considering the merits of the underlying claim, *i.e.*, the ineffective assistance of trial counsel for failing to present medical testimony to challenge the sexual assault allegations where no physical corroboration of the assault was found. See *Johnson*, 2018 IL 122227, ¶¶ 21-24 (remanding for second-stage proceedings where private postconviction counsel failed to provide reasonable assistance).

¶ 43    The State responds that we should instead undertake a "*Strickland*-like analysis" (see *Strickland v. Washington*, 466 U.S. 668 (1984)) in analyzing Mr. Nicasio's claims. See *People v. Zareski*, 2017 IL App (1st) 150836, ¶¶ 51, 55, 59 (providing that Illinois Supreme Court Rule 651(c) (eff. July 1, 2017) does not apply to counsel privately retained to file the initial petition and adopting a *Strickland*-like analysis to evaluate counsel's performance). The underlying reasoning is to avoid "pointless remands to trial courts for repeated evaluation of claims that have no chance of success." *Id.* ¶ 59.

¶ 44    Mr. Nicasio contends that recent decisions of the supreme court have "wholly undermined" the analysis in *Zareski* and notes that one panel in the Fifth District found that *Zaraski* had been "effectively overruled" by the supreme court's decision in *People v. Johnson*, 2018 IL 122227. *People v. Williams*, 2024 IL App (5th) 220752-U, ¶ 33. We observe, however, that the supreme court recently decided *People v. Carroll*, 2026 IL 131360 and *People v. Williams*, 2025 IL 129718. In both cases, the appellate courts relied on *Zareski* in analyzing postconviction counsel's performance. See *People v. Carroll*, 2024 IL App (4th) 231207, ¶¶ 64-65; *People v. Williams*, 2023 IL App (5th) 220185-U, ¶¶ 18-20, *overruled by*, 2025 IL 129718. Thus, the supreme court had the opportunity to address *Zareski* on appeal, but declined to do so in either case. Rather, in both cases, the supreme court affirmed the dismissal of the postconviction petitions, finding that postconviction counsel was not unreasonable. *Carroll*, 2026 IL 131360 87-90; *Williams*, 2025 IL 129718, ¶ 49-50.

¶ 45    We therefore agree with the State and apply the *Strickland*-like standard to evaluate privately retained postconviction counsel's performance at this first stage postconviction petition proceeding. *People v. Lowe*, 2026 IL App (1st) 241544-U, ¶ 37; *People v. Davis*, 2025 IL App

(1st) 241094-U, ¶ 22 (*appeal filed*, No. 132402); *People v. Robinson*, 2025 IL App (1st) 231594-U, ¶ 27; *People v. Perry*, 2024 IL App (1st) 230167-U, ¶ 29; see also Ill. S. Ct. R. 23(e)(1) (eff. June 3, 2025) (nonprecedential orders entered under Illinois Supreme Court Rule 23(b) may be cited as persuasive authority). As such, Mr. Nicasio must show that he was prejudiced by the claimed errors undertaken by postconviction counsel. *Carroll*, 2024 IL App (4th) 231207, ¶ 64. More specifically, we consider "whether there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." *People v. Ayala*, 2022 IL App (1st) 192484, ¶ 162.

¶ 46    Here, Mr. Nicasio cannot establish that he was prejudiced by the lack of medical expert testimony. At trial, the question of whether physical evidence of trauma would be present three years after the sexual assault ended was argued by Mr. Nicasio for a directed finding and by the parties during closing and considered by the trial court. While no medical expert testimony was presented on the issue, "there is no requirement that a victim's testimony be corroborated by medical evidence to sustain a conviction for criminal sexual assault." *People v. Willer*, 281 Ill. App. 3d 939, 348-49 (1996); see *People v. Guaderrama*, 2024 IL App (1st) 230120-U, ¶ 72 (recognizing the same); Ill. S. Ct. R. 23(e)(1) (eff. June 3, 2025) (nonprecedential orders entered under Illinois Supreme Court Rule 23(b) may be cited as persuasive authority).

¶ 47    Moreover, there was considerable evidence of the sexual assaults based on A.G.'s testimony, which the court found corroborated by Eliseo and the nurse practitioner. We find no arguable merit to the claim that the trial court would have acquitted Mr. Nicasio had trial counsel presented medical expert testimony and no arguable claim that trial counsel was ineffective for failing to retain a medical expert witness to present evidence regarding expected physical injuries

of sexual assault years later. We therefore cannot conclude that Mr. Nicasio's postconviction counsel rendered unreasonable assistance by failing to attach the affidavit of a medical expert where there was no reasonable likelihood that any such evidence would have changed the result of proceedings.

¶ 48     In sum, Mr. Nicasio has not shown ineffective assistance of trial counsel or unreasonable assistance of postconviction counsel. We therefore find that the circuit court properly summarily dismissed his petition at the first stage of postconviction proceedings.

¶ 49     For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 50     Affirmed.